**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-182 (BAH)** |
| **v.** | : | |
| | : | |
| **DAVID JOHNSTON,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant David Johnston to 42 days incarceration, to be served intermittently in 14 day installments, as a condition of and within the first 12 months of a 36 month term of probation, pursuant to 18 U.S.C. § 3562(b)(10), and $500 in restitution.

**I.      Introduction**

Defendant David Johnston, a 66-year old former attorney suspended from the practice of law and who has worked as a contractor for the United States Department of Defense, and his co-defendant, Chad Clifton, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.

Johnston pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 42 days incarceration and probation is appropriate in this case because Johnston (1) was present to witness, and likely video recorded, several violent clashes between rioters and law enforcement on the west lawn before deciding to enter the building; (2) braggingly

1

exclaimed – after making it past the violent altercations between rioters and law enforcement – that he "broke[] past the barriers, [and] reached the doors of the Capitol," alongside his co-defendant, who simultaneously exclaimed, "the policemen have been overwhelmed, the amount of people . . . coming up the stairs, the patriotism!"; (3) entered the Capitol building about 10 minutes after it had been breached by force, while others around him climbed through broken windows and broken glass; (4) spent a significant length of time – 30 minutes – inside the Capitol building during the riot; (5) watched as rioters obstructed and prevented sliding bay doors from closing and then proceeded through those doors towards the Visitor's Center; (6) video recorded or photographed a confrontation between rioters and police officers in the Visitor's Center, yet failed to leave the area (or building) until officers corralled him out; (7) failed to take responsibility for his actions by referring – in both a podcast and in written journalism – to this as a "politically charged matter," despite being educated in the law and fully aware that such conduct was illegal; and (8) counseled his co-defendant in attempt to avoid consequences after January 6.

Johnston's conduct on January 6, like the scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement officers, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

Here, Johnston's participation in a riot that actually succeeded in halting the Congressional certification along with his – at best – willful blindness to the multiple warning signs for danger all around him call for a sentence of 42 days in custody as part of a three year term of probation.

## II.       Factual And Procedural Background

*The January 6, 2021 Attack On The Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 26 (Statement of Offense), at 1-4; ECF No. 1-1 (Statement of Facts).  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.  The sheer number of people who chose to be a part of this attack on democracy overwhelmed the Capitol despite attempts by law enforcement to fight them off.  Even those who did not attack others, destroy property, or threaten members of congress themselves supported those who did by joining them.  The presence and participation of each and every one of these people encouraged and enabled other rioters as they breached the grounds and the building.

*David Johnston's Role In The January 6, 2021 Attack On The Capitol*

On January 5, 2021, David Johnston and Chad Clifton traveled from their homes in South Carolina to Washington, D.C. to attend the "Stop the Steal" rally.  Johnston seemed to hope that there might be more than just a speech at the ellipse.  When convincing co-defendant Clifton to join his travel to Washington, D.C., Johnston explained, "Trump is actually asking people to turn out.  I hope he has something significant to overturn these cheat-states."  Johnston's co-defendant, Clifton, also expected more than just a rally, as he texted on January 5, 2021:  "There's gonna be a whole bunch of shit change and hopefully in the next couple of days stop the steel that's what I'm doing for!"

After attending the former President's speech, Johnston and Clifton walked toward the Capitol building.  Clifton recorded some of the walk on his cellphone, narrating things like, "Look at where we are, look at where we are going," and "exciting times are coming!"  Johnston can be

seen in Clifton's video, wearing metal rimmed glasses, a blue winter cap with white and red trim and embroidered with a circular "45" logo and the word TRUMP, dark colored winter jacket with The North Face logo on the front right chest, and yellow gloves.



Johnston and Clifton made it to the West front of the Capitol and joined the surge of rioters. Johnston and Clifton approached the back of the crowd and began filming the chaos:



The pair worked their way closer to the front of the crowd.  Eventually, Johnston and Clifton were nearly at the forefront of the crowd of hundreds of rioters.  Bike racks aligned to

prevent rioters from progressing and law enforcement officers wearing riot gear held a line in front of Johnston.

 

*Screenshots of a video recording filmed by co-defendant Chad Clifton,
who was standing next to Johnston*

Rioters threw objects at law enforcement from the crowd, including, according to co-defendant Clifton, batteries; numerous flash bang grenades exploded; chemical irritant filled the air; and rioters became increasingly violent.  Near Johnston and Clifton, law enforcement deployed the Long Range Acoustic Device or LRAD, which consists of deafening sirens followed by audible warnings, such as "This is the Metropolitan Police Department.  This area is now a restricted access area. . . .  All people must leave the area immediately."   Rather than comply with the orders, Johnston remained in the increasingly violent crowd.

In front of Johnston, rioters began clashing with law enforcement officers and the altercations turned more violent.  Bike racks were lifted, chemical irritant was sprayed, and violent

confrontations ensued.  Clifton sent a text to a family member confirming the obvious:  "It's insane now."

 

*Screenshots of video recording filmed by co-defendant Chad Clifton,*
*who was standing next to Johnston*

None of this deterred Johnston from continuing to progress to the Capitol building. Johnston climbed stairs up to the next level where rioters were breaking into the building and other chaos ensued around him.  Once he reached the top of the stairs, Johnston pulled out his cell phone and signaled for co-defendant Clifton to join a video.  After he started recording, Johnston exclaimed, "we've broken past the barrier, we've reached the doors of the Capitol!"  Johnston turned his phone towards the building, and further exclaimed, "That is the Capitol!"  Co-defendant Clifton added, "we've broken past the barrier . . . .  The policemen have been overwhelmed."



        At approximately 2:23 p.m., Johnston entered the Capitol building through the Senate

Wing Door, a mere ten minutes after the initial violent breach of the door.  When Johnston entered,

the Senate Wing Doors and windows had just been violently broken and smashed, loud alarms

were blaring, there was broken glass on the floor, and rioters were climbing through windows.

None of this deterred Johnston.



Johnston immediately turned right and walked toward the Crypt.  Clifton recorded on his phone as they walked through the Capitol building.  In the video, rioters can be heard loudly chanting "USA USA USA" and sirens blared loudly in the background.  The pair proceeded on.

Once inside the Crypt, Johnston quickly joined a mass of rioters that greatly outnumbered police officers and had just broken the police line.  People can be heard screaming, whistling, and chanting, "Stop The Steal."  Clifton recorded himself and Johnston inside the Crypt and posted the video on TikTok with the caption: "Storming the capital building everybody's going to come way more in DC today first hand I was there."

 

Johnston and Clifton remained in the mayhem in the Crypt area for about five minutes. With police officers pushed aside, rioters, Johnston included, continued to trek deeper into the Capitol building.



From there, Johnston and Clifton made their way into the Crypt Lobby at about 2:30 p.m. As Johnston walked into the Crypt Lobby, there were two plainly visible rolling bay doors starting to close, but rioters barricaded chairs and their bodies underneath the doors, and the safety stopped the doors from closing.





The rolling bay doors were yet another clear sign that rioters should not have progressed farther into the Capitol building, but it was no deterrent to Johnston.  In fact, as a second rolling bay door closed, Johnston moved closer, watching the rolling bay door start close and witnessing his fellow rioters obstruct the door so that it started to open again, keeping the Capitol hallways accessible to rioters breaching the building.



Johnston remained in the area, holding his cell phone and taking pictures or videos of the chaos ensuing around him.



Johnston and Clifton then turned around and walked back into the Crypt.  While in the Crypt, they both took numerous pictures or videos on their cell phones.  Other rioters appeared to be exiting the Crypt where Johnston had originally entered.  Rather than follow them out, he continued to make his way throughout the Crypt videoing or taking pictures.






Johnston then went back through the Crypt lobby, and progressed toward the Visitor's Center.



The pair took the stairs down to the Visitor's Center, where they remained for five minutes.

At approximately 2:40 p.m., Johnston and Clifton watched police subdue a rioter. Rather than

leave, Johnston pulled out his cell phone and began moving closer to the commotion while he recorded or took pictures.[1]





Johnston and Clifton remained in the Visitor's Center – primarily filming interactions between officers and riots – until officers corralled them out.  The pair were two of the last rioters escorted out of the area, as Johnston couldn't help but turn around and take another picture or video of the officers before he finally walked up the stairs.

---

[1] Based on a review of CCTV footage, Johnston appeared to film or take pictures of much of his time inside the Capitol.  We requested Johnston to turn over any videos or pictures from January 6, 2021.  Johnston stated that he did not believe that he permanently deleted any pictures or videos, but could only find one photo from the day – where he was outside.



With officers behind them this time, Johnston and Clifton – for the third time – made their

way through the Crypt Lobby, at about 2:47 p.m.



The pair made their way back through the Crypt for the third time.



Johnston and Clifton walked back to the Senate Wing Doors where they had originally entered the building.  The corridor was full of rioters who had freshly gained access to the building.  Johnston exited the building by climbing out of a window at 2:52 p.m.



In total, Johnston spent about 30 minutes inside the Capitol, during which time he witnessed rioters prevent rolling bay doors from closing, police presence, and an altercation between rioters and law enforcement.  Johnston would have heard blaring sirens and seen lawless chaos around him—conduct that's a far cry from any proper or lawful action in a government

building.  Once inside, Johnston made no effort to leave until after an altercation between police and rioters that led to the police corralling rioters out of the Visitor's Center.  In fact, Johnston had many opportunities to remove himself from the disorder of January 6 but was all too happy to continue his participation by taking pictures or videos of the chaos around him.  Indeed, Johnston's co-defendant confirmed when he texted a family member shortly after the pair left the Capitol and said, "I did go inside and I did get a lot of the action that was going on."

Johnston has admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so, and he engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

*Johnston's Post-January 6 Conduct*

After January 6, Johnston sent messages to his co-defendant, expressing fear that the government would use facial recognition technology to "try and make trouble for people," and worried that "Dems might be looking for revenge."  Johnston counseled his co-defendant to "keep quiet" and "say nothing" as it relates to their conduct on January 6.[2]

> Chad: "You need to call me ASAP:
>
> Dave: "What?? Keep quiet. Say nothing. Call me. Another thought just occurred to me. Whenever they want someone to "help", they will normally offer that person immunity in exchange for their help. And that agreement is drawn up in writing by attorneys BEFORE anyone provides any "help". So if they really want any "help" then let's type up an immunity agreement first.
>
> Chad: "So I should tell him he needs to offer me immunity before I give him any information. No I don't wanna talk to him."
>
> Dave: "But one never utters a syllable before the agreement is in place. Not one word. Your attorney would approach them and offer "help" in exchange for immunity.  But they aren't looking for help. They're looking to get info to use against you."

---

[2] Chad refers to Chad Clifton and Dave refers to David Johnston, co-defendants in this case, 22-cr-182.

Co-defendant Clifton also messaged Johnston:

> **1/8/2021 13:24(UTC-5):** Chad to Dave: "I'm telling you man I'm fucking telling you this shit ain't over and these motherfuckers are going to die this weekend. He is going to sickness strongest snipers the strongest military forces out and only patrol for these people. We are running out of time and it is time to take action in the fullest a force needed to complete this mission! I believe in my president and what he's doing this is all a game of chess and who has the strategy? We can see he does!
>
> It will be a day of reckoning when John John shows up and does the tail all! We may not be out of the woods but we are trimming trees"

In response, Johnston sent Clifton a picture of rioters breaching the Capitol:



After learning that the FBI had been investigating them, Johnston and Clifton remained concerned about their impending arrests.  For example, Clifton had sent a text message referencing the investigating special agent, Steve Jones:

> **2/25/2021 10:52(UTC-5):** Chad: "I did just get off the phone with Joe good he listen to everything the short version of a long day and he is snooping around and he's going to make some calls and see if we can get Steve Jones (FBI Special Agent) to fuck off and never come back to my job again so I can get a clarification later"

The pair discussed Clifton retaining an attorney since Johnston would not be able to represent him.  Then, on the day of Johnston's and Clifton's arrests, Clifton sent Johnston a warning text that said, "I just wanted to let you know it's happening!"  After Johnston appeared in court, he provided written comment to the news media about his arrest, and referred to the case as

a "politically charged" matter.  Johnston also appeared on the "Kelly Golden Show Podcast" and reiterated that he thought "this was so politically charged," and then equivocated his arrest to a ploy trying to "gin up as much publicity around this January 6 stuff as they possible can going into midterms."

### David Johnston's Interview

As a condition of his plea agreement, Johnston met for an interview with the FBI.  During that interview, Johnston accepted responsibility for the charge that he pleaded guilty to.  He claimed that he entered the Capitol primarily out of a sense of curiosity and that, after reflection, he considered his participation on January 6 to be a dreadful mistake.  He recalled seeing rioters in tactical gear and remembered one rioter in the building who was holding an axe; Johnston claims that's when he decided it was time to leave the Capitol.  At the interview, Johnston appeared to be forthcoming about his conduct and accept responsibility for his actions.

### The Charges and Plea Agreement

On May 16, 2022, the United States charged David Johnston by criminal complaint with violating 18 U.S.C. § 1752(a)(1), (a)(2) and 40 U.S.C. § 5104(e)(2)(D), (e)(2)(G).  On May 20, 2022, law enforcement officers arrested him in North Charleston, South Carolina.  On May 23, 2022, the United States charged Johnston by a four-count Information with violating 18 U.S.C. § 1752(a)(1), (a)(2) and 40 U.S.C. § 5104(e)(2)(D), (e)(2)(G).  On September 23, 2022, pursuant to a plea agreement, Johnson pleaded guilty to Count Four of the Information, charging him with

a violation of 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, Johnston agreed to pay $500 in

restitution to the Department of the Treasury.

### III.    Statutory Penalties

Johnston now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).

As noted by the plea agreement and the U.S. Probation Office, Johnston faces up to six months of

imprisonment and a fine of up to $5,000.  Johnston must also pay restitution under the terms of his

plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79

(D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not

apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies

the factors a court must consider in formulating the sentence. Some of those factors include: the

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence,

§ 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as

described below, the Section 3553(a) factors weigh in favor of 45 days incarceration, 36 months

of probation, and $500 in restitution.

### A.  The Nature And Circumstances Of The Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy."

*United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while

staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Johnston's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Johnston, the absence of violent or destructive acts is not a mitigating factor.  Had Johnston engaged in such conduct, he would have faced additional criminal charges.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at Johnston's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or encouraged violence; (3) whether the defendant engaged in any acts of destruction or encouraged destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant

on a spectrum as to their fair and just punishment.  Had Johnston personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Johnston spent about 30 minutes inside the Capitol building during the riot, after he entered the Capitol in the midst of destruction and violence.  Before entering, Johnston had a front row seat to violent interactions between law enforcement and rioters, and he appeared to be videoing these altercations.  He could see bike racks set up as barriers and law enforcement lined up in riot gear.  He was front and center when the Metropolitan Police Department deployed the LRAD warnings instructing rioters that they were in a restricted area and needed to disperse.   He could hear screeching sirens and see flash bangs igniting, while he stood near rioters throwing objects at law enforcement officers.  A few minutes later, Johnston recorded a video of himself bragging about breaking "past the barriers" and reaching the doors of the Capitol building.   After then deciding to enter the Capitol building, Johnston progressed throughout the building and eventually entered a room where rolling bay doors started to close.  Rioters hurled themselves and other objections under the doors and successfully kept the doors from closing, which would have limited rioters' access to the building.  Johnston was front and center to witness this.  Eventually, Johnston walked right through one of the doorways where a rolling bay door had tried to close, and made his way downstairs to the Visitor's Center.  Several minutes later, a confrontation between rioters and police officers broke out.  Rather than leave immediately, Johnston began recording the interaction on his cell phone.  He left only when corralled out by law enforcement.  After January 6, rather than accept immediate responsibility, Johnston counseled his co-defendant in attempt to avoid consequences, and twice referred to this as a "politically charged matter" when interviewed

by a podcaster and a newspaper journalist.  Accordingly, the nature and the circumstances of this offense reflect a need for a period of incarceration and probation.

### B.  The History And Characteristics Of Johnston

As set forth in the PSR, Johnston's history and characteristics show that he had several stability factors present in his life at the time of his offense, such as a history of employment and school and no criminal history.  ECF No. 34, ¶¶ 20-24, 37-42.  Johnston has previously been employed for six years as a contractor for the Department of Defense in Baghdad, Iraq, serving as "a consultant on security and life support contracts."  *Id.* at 42.

Johnston appears to have been compliant with his conditions of pre-trial release.  He also appears to have taken responsibility for his actions by pleading guilty, which demonstrates an acceptance of responsibility.

Johnston's status as a practicing attorney on January 6, and one who had previously served as a consultant to the United States Department of Defense, is a particularly aggravating feature of this case.  Unlike other professionals, attorneys are rigorously taught about the importance of adhering to the rule of law.  In their professional work and continuing education, they are frequently reminded that the rule of law is an essential component of a free and orderly society.  Rather than hewing to that ethic, Johnston trashed the law on January 6 and encouraged his co-defendant Clifton to avoid coming under suspicion by law enforcement officials tasked with uncovering what happened on January 6.  This Court should give significant weight to those factors in calculating the appropriate sentence in this case.

### C.  The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense And Promote Respect For The Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need For The Sentence To Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).  General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [Johnston] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

The court should also consider specific deterrence.  On one hand, Johnston's actions highlight the need for deterrence.  Johnston knew that his entry was unlawful, and it was evident to him and anyone else at the Capitol that the situation outside and inside the building had devolved into a riot.  Even before he entered the Capitol, Johnston was front and center when the Metropolitan Police Department deployed warnings on the LRAD, and he was present to witness violence against law enforcement long before he entered the building.  He was fully aware that he had no permission to enter—in fact, he exclaimed that he "broke[] past the barrier" while his co-

defendant added that "the policemen have been overwhelmed.  On January 6, Johnston was a practicing attorney, and thus, even more so than other rioters, should have known better than to engage in an obviously unlawful attack on the United States Capitol building and democracy. Johnston absorbed the chaos of January 6 primarily from the lens of his cell phone camera during the course of his thirty minute illegal venture through the Capitol building, as well as his presence in the violent lead up to the breach on the front West lawn.  And Johnston made an attempt to leave the building only after he was corralled out by law enforcement.

After January 6, rather than accept immediate responsibility for his actions, he sent messages to his co-defendant, expressing fear that the government would use facial recognition technology to "try and make trouble for people."  Johnston counseled his co-defendant to "keep quiet" and "say nothing" as it relates to their conduct on January 6 in attempt to avoid helping law enforcement.  And although Johnston has now pled guilty, when speaking to the news media shortly after his arrest, he twice referred to his case as a "politically charged" matter.  Thus, the need to send a message that Johnston cannot stick his head into the sand to follow a violent mob and ignore the law calls for a serious sentence in this case.

### E.  The Need To Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[3]   Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum

---

[3] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[4] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

Johnston has pleaded guilty to Count Four of the Information, charging him with Disorderly Conduct on Capitol Grounds in violation of 18 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid

---

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity.  Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years.  For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences.  The statutory range for a petty offense is zero to six months.  Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

First, in *United States v. Lavin*, 21-cr-596 (BAH), 21-cr-596 (BAH), the defendant, like Johnston, spent approximately 30 minutes inside the Capitol building. Once inside the building, Lavin and Johnston followed approximately the same route throughout the Capitol building. They both entered the building within minutes of each other through the Senate Wing Door and proceeded to the Crypt, where they joined a large group of rioters that confronted U.S. Capitol Police Officers who had formed a line blocking rioters from advancing farther into the building. The group of rioters quickly outnumbered the officers and were able to push past them. Lavin, like Johnston, also went through the Crypt Lobby where rioters prevented rolling bay doors from closing. Johnston witnessed the rioters forcefully prevent rolling bay doors that attempted to close, yet chose to go through them anyway, descending to the Visitor's Center. Once in the Visitor's Center, Lavin (and Johnston) recorded or took pictures of a confrontation between law enforcement and rioters. Defendant Lavin proceeded back up the stairs into the Crypt Lobby, whereas Johnston waited longer, until law enforcement corralled the last of the rioters out. Lavin, like Johnston, did not make any posts about January 6 on social media. However, Lavin sent pictures to friends from January 6, much like Johnston sent at least one photo from January 6 to co-defendant Clifton. When interviewed by law enforcement agents, Lavin minimized her involvement in the riot, which is similar to Johnston's early declaration to the news media that matter was "politically charged." During his interview with law enforcement after entering a plea agreement, Johnston disclaimed witnessing any violence between law enforcement and rioters on January 6, a contention that is incredible given his proximity to several violent clashes, including on the West side of the Capitol, which were captured on Johnston's co-defendant's phone. The

Court sentenced Lavin to 10 days incarceration and 36 months of probation.[5]   Unlike Johnston, Lavin was not a practicing attorney and prior consultant to the Department of Defense and did not encourage another person to avoid detection by law enforcement officials for their conduct on January 6, a highly aggravating feature of Johnston's conduct.

Second, in *United States v. Sorvisto*, 21-cr-320 (ABJ), the defendant (and his co-defendant Dresch), like Johnston, made his way through tear gas and unruly crowds on the West side of the Capitol to make his entrance into the Capitol building at approximately 2:25 p.m., less than 15 minutes after the initial breach.  Unlike Sorvisto, Johnston bragged about breaking past the barriers and reaching the Capitol building in the midst of this chaos and was front and center to hear the LRAD warnings.  Like Johnston, when Sorvisto entered the Capitol building, he would have likely seen broken glass and heard alarms as he went through the Senate Wing doors.  Once inside, Sorvisto made a similar trek as Johnston, turning right after entering the building and heading toward the Crypt, where rioters outnumbered and eventually overran a line of officers.  Sorvisto entered the Crypt Lobby near Johnston and Clifton, where the sliding bay doors were prevented by rioters from closing.  In total, Sorvisto was in the Capitol for about 25 minutes, which was a few minutes less than Johnston.  Like Johnston, Sorvisto left only when instructed by law enforcement.  Sorvisto, also like Johnston, did not come forward or immediately attempt to cooperate with law enforcement after January 6, despite knowing the wrongfulness of his conduct. In fact, Sorvisto disposed of the distinctive jacket that he wore on January 6 and instructed his co-defendant Dresch to delete the digital photography from the Capitol.  Judge Berman Jackson

---

[5] The Court sentenced Lavin's daughter, Krzywicki, to three months of home confinement and 36 months of probation.

sentenced Sorvisto to 30 days of incarceration.  Again, Johnston's status as a practicing attorney on January 6 makes his conduct more aggravating than Sorvisto's and justifies a longer sentence.

Finally, in *United States v. Pham*, 21-cr-00109 (TJK), the defendant, an 18-year Houston Police Officer with no criminal history, spent approximately 20 minutes in the Capitol building, which included walking through Republican House Leader Kevin McCarthy's office suite.  He took selfie photographs inside and outside of the Capitol and posted one to social media that he promptly took down.  Unlike Johnston, he voluntarily spoke to the FBI before his arrest.  While Pham initially denied entering the Capitol, he quickly admitted that he did enter the building.  Like Johnston, Pham insisted that he did not see signs of violence or warning signs of danger when he entered, a claim that the court found suspect in Pham's case.  Johnston spent more time in the Capitol than Pham, recorded an altercation between law enforcement and a rioter inside the building, witnessed and likely recorded elongated violent clashes on the West side of the Capitol before entering, was present to hear the LRAD warnings, bragged about breaking past barriers, and failed to take responsibility for his actions by turning himself in.  Otherwise, they share common attributes.  The government, emphasizing the position of trust held by the defendant as a police officer, requested 60 days' incarceration and $500 in restitution.  The court sentenced Pham to 45 days' incarceration, a $500 fine, and $500 in restitution.

## V.   A Sentence Of Probation May Include Imprisonment As A Condition Of Probation

A sentencing court may impose imprisonment as a condition of probation under 18 U.S.C. § 3563(b)(10).  Under Section 3563(b)(10), the Court may impose an imprisonment term in distinct intervals, with each interval not exceeding two weeks.  Second, a sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—under 18 U.S.C.

§ 3561(a)(3).  *See United States v. Little*, 590 F. Supp. 3d 340, 351 (D.D.C. 2022) (explaining that

a sentence of 60 days of imprisonment followed by three years of probation is permissible under

Section 3561(a)(3) for a defendant convicted of a single petty offense).[6]

In this case, a sentence of 42 days of imprisonment and 36 months of probation is sufficient,

but not greater than necessary, to serve the purposes of sentencing under 18 U.S.C. § 3553(a)(2).

The Court may impose such a sentence either under Section 3563(b)(10), with a term of

imprisonment as a condition of probation, or as a split sentence under Section 3561(a)(3).

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.

Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant remain in the custody of the Bureau of Prisons during nights, weekends or other

intervals of time, totaling no more than the lesser of one year or the term of imprisonment

authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

---

[6] Several judges of this District have imposed a split sentence on a defendant convicted of a single petty offense.  *See, e.g.*, *United States v. Sarko*, No. 21-cr-591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21-cr-342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ([T]he Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF No. 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF No. 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21-cr-686 (FYP), ECF No. 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF No. 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21-cr-607 (EGS), ECF No. 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21-cr-601 (JDB), ECF No. 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21-cr-342 (PLF), ECF No. 74 (D.D.C. August 1, 2022) (same).

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[7]

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation.  18 U.S.C. § 3653(b)(10).  Section 3563(b)(10) authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation.  *Id.*  Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the defendant to serve up to six months in prison as a condition of probation.  *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10).  Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (finding continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute

[7] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10). *See Anderson*, 787 F. Supp. at 539. Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days. *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v. Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation). Imposing an intermittent confinement sentence with 42 days of imprisonment as a condition of probation is appropriate in this case.

To be sure, earlier in the investigation of the January 6 attack on the Capitol, the government refrained from recommending intermittent confinement sentences given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. At this point, however, multiple jury trials have successfully occurred, *see* Standing Order No. 22-64 (BAH), at 3 (D.D.C. Nov. 9, 2022) (noting that the Court has "forg[ed] ahead" and eas[ed] the backlog" of criminal cases since the

Omicron surge began to abate in February 2022), and general COVID trends appear to show a decrease in cases.[8]

## VI.    A Sentence Imposed For A Petty Offense May Include Both Imprisonment And Probation

The government's recommended sentence of 42 days of imprisonment as part of a 36 month term of probation is also permissible under 18 U.S.C. § 3561(a)(3).  As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses."  *Little*, 590 F. Supp. 3d at 351; *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022).  Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[9]

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Johnston to 42 days incarceration, to be served intermittently in 14 day installments, as a condition of and within the first 12 months of a 36 month term of probation, pursuant to 18 U.S.C. § 3562(b)(10), and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

[8] *See* Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last viewed Nov. 21, 2022).

[9] The defendant's appeal of the split sentence imposed in *Little* is pending.  The D.C. Circuit heard oral argument on November 2, 2022.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     _s/ Ashley Akers_
        Trial Attorney
        MO Bar No. 69601
        Detailed to the U.S. Attorney's Office
        601 D Street NW
        Washington, DC 20001
        (202) 353-0521
        Ashley.Akers@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 2nd day of December, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ *Ashley Akers*
Trial Attorney