**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-182 (BAH)** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **DAVID JOHNSTON,** | : | |
| | : | |
| Defendant. | : | |

**SENTENCING MEMORANDUM OF DEFENDANT DAVID JOHNSTON**

Defendant David Johnston, through undersigned counsel, respectfully submits this sentencing memorandum in connection with the above-referenced matter.  For the reasons which follow, Mr. Johnston respectfully requests that Your Honor reject the Government's speculative and unsubstantiated argument for incarceration, and instead accept the more balanced sentencing recommendation of U.S. Probation of a non-custodial probationary term of 12 months with the special conditions of supervision requiring the payment of restitution, payment of a fine, financial disclosure, and a firearm restriction during the term of supervision.

I.      **INTRODUCTION**

Mr. Johnston's is a sixty-six year old man who spent his first sixty-five years in a law-abiding fashion, working for the last decade as an attorney and, before that, as a contractor for the Department of Defense in Baghdad, Iraq.  Mr. Johnston chose to travel to the District of Columbia on January 6, 2021, like many other individuals. But as the record evidence in this matter makes clear, unlike several other individuals, Mr. Johnston did not travel to the District of Columbia with the purpose to engage in any violent, riotous, or assaultive behavior.  While at the Capitol, Mr. Johnston did not touch or strike anyone else with any objects or weapons, did not throw any items like flags or smoke bombs, did not

1

use pepper spray or other disruptive device, did not dress in costume or attempt to mask his identity, and did not join in the riot.  He did not damage or destroy any property; he did not steal or convert any so-called "souvenirs."  Mr. Johnston has never been and is not affiliated with any extremist group or organization and has not engaged in any activities sponsored or sanctioned by these groups.  Mr. Johnston did not engage in any coordination discussions with any other individuals in advance of his travel to the Capitol (apart from arranging travel), and upon his return he did not engage in any bragging, puffery or salacious discussions regarding what transpired on that day.

Nonetheless, Mr. Johnston chose to accept responsibility for his participation and role in the January 6, 2021 events.  He went to Washington, D.C. on that date with a neighbor, and entered the Capitol.  We urge this Court to consider Mr. Johnston's specific role in the offense in its proper context and reject the Government's overly generalized description of the events of that date, which identical description has been used in the Government's sentencing memoranda with other January 6 defendants.  A more careful focus on Mr. Johnston's actual conduct on that date, as opposed to a rehashed and generalized description of the events, provides ample justification for distinguishing Mr. Johnston from the scores of other individuals convicted for events which occurred at the Capitol on that day.  Unfortunately, in requesting that Mr. Johnston serve 42 days incarceration for this misdemeanor *to be served intermittently in 14 day installments to keep Mr. Johnston in solitary confinement while incarcerated,* the Government is attempting to visit the sins of the scores of other individuals who participated in violent and destructive behavior at the Capitol upon Mr. Johnston. While we understand that incarceration may be appropriate for some individuals who were at the Capitol on January 6th, Mr. Johnston has never met or coordinated with these individuals, never joined in their riotous activities, and has never espoused or regurgitated any violent principles or beliefs.  Mr. Johnston should have exercised better judgment while at the Capitol, but he should not be incarcerated for that one lapse in judgment in an otherwise law-abiding sixty-six year life.

2

**II.     THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a) DO NOT SUPPORT INCARCERATION IN THIS MISDEMEANOR CASE.**

The United States Sentencing Guidelines do not apply to Class B misdemeanors.  U.S.S.G. § 1B1.9.  Accordingly, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining the appropriate sentence.  These factors include (i) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (ii) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[,] (B) to afford adequate deterrence to criminal conduct[,] (C) to protect the public from further crimes of the defendant[,] and (D) to provide the defendant with needed [rehabilitation]"; and (iii) "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct[.]"  18 U.S.C. § 3553(a).  As discussed below, these factors squarely counsel in favor of a non-custodial probationary sentence of twelve months' probation.

A. <u>The Court Should Evaluate the Actual Offense Conduct, Not the Speculative and Unsupported Assertions of the Government Which Are Designed to Exaggerate Mr. Johnston's Role in the Events of January 6th.</u>

Mr. Johnston pleaded guilty to one misdemeanor count of violating 40 U.S.C § 5104(e)(2)(G), a charge not involving rioting, violence or destruction, but which instead proscribes conduct involving parading, demonstrating, or picketing in a Capitol Building.  The Government, however, repeatedly references unnamed rioters in its sentencing brief to artificially inflate Mr. Johnston's role in the events of January 6th, and concomitantly employs careless language throughout its brief suggesting Mr. Johnston was one of those "rioters."  In point of fact, the Government repeatedly states that Mr. Johnston participated as a *rioter* in a violent riot when there is no evidence that he engaged in any violence, rioting or destructive behavior.  <u>See</u>, <u>e.g.</u>, Government Sentencing Memorandum at 2  ·  ("Johnston's *participation in a riot* that actually succeeded in halting the Congressional certification . . . call for a sentence of 42 days in custody as part of a three-year term of probation"); <u>id.</u> at 3 ("*a riot cannot occur without rioters, and each rioter's actions* – from the most mundane to the most violent –

3

contributed, directly and indirectly, to the violence and destruction of that day"); id. at 5 ("Rioters threw

objects at law enforcement from the crowd[.]"); id. at 7 ("Johnston entered the Capitol building through

the Senate Wing Door, *a mere ten minutes after the initial violent breach of the door*"); id. at 8

("*Johnston quickly joined a mass of rioters that greatly outnumbered police officers and had just broken

the police line.*"); id. at 8 (With police officers pushed aside, rioters, *Johnston included*, continued to trek

deeper into the Capitol building"); id. at 13 ("The pair [Johnston and Clifton] *were two of the last rioters

escorted out of the area*[.]"); id. at 20 ("*No rioter was a mere tourist that day.*") (emphasis added in

italics).

In contrast to these conclusory assertions, there is not a scintilla of evidence that Mr. Johnston

broke any police line, violently breached any door, took part in overwhelming police officers or

participated in *any* riot activities.  Mr. Johnston was not even charged with, much less convicted of

rioting, a felony offense under 18 U.S.C. § 2101.[1]  The record evidence instead demonstrates that Mr.

Johnston actually *shook hands with one of the law enforcement officers* prior to departing the Capitol, a

_____

[1] Section 2101(a) criminalizes rioting, as follows:

> (a) Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign
> commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent—
> (1) to incite a riot; or
> (2) to organize, promote, encourage, participate in, or carry on a riot; or
> (3) to commit any act of violence in furtherance of a riot; or
> (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of
> violence in furtherance of a riot;
> and who either during the course of any such travel or use or thereafter performs or attempts to perform
> any other overt act for any purpose specified in subparagraph (A), (B), (C), or (D) of this paragraph
> [paragraph (1), (2), (3), or (4) of this subsection]—
> Shall be fined under this title, or imprisoned not more than five years, or both.

18 USCS § 2101.  Indeed, there is no evidence that Mr. Johnston incited a riot, organized, promoted, encouraged or
participated in a riot, committed any acts of violence in furtherance of a riot or aided or abetted any person in
inciting or participating in a riot.

fact later acknowledged by the Government in an email to defense counsel dated September 20, 2022

(handshake pinpointed by the Government at Camera 7164 (19hr, 41sec)).

Nonetheless, in its sentencing brief the Government makes no mention of that demonstration

of goodwill by Mr. Johnston.  Instead, the Government repeatedly hearkens back to the violence of that

day, invoking the conduct of scores of unnamed and unidentified individuals to artificially inflate Mr.

Johnston's role in the misdemeanor offense of parading, demonstrating or picketing.  In so doing, the

Government essentially is urging this Court to consider as "relevant conduct" the unconnected acts of

other unnamed individuals rioting at the Capitol that day, even though Mr. Johnston was not charged

with or convicted of conspiracy, violence, destruction of property, or even rioting. [2]

Equally important, the Government has not identified or disclosed the names of these scores of

violent and riotous individuals to the defense, thus removing the defense's ability to further investigate

and distinguish these individuals from Mr. Johnston.  Yet the Government repeatedly invokes these

---

[2] The United States Supreme Court has underscored that "Congress' basic statutory goal -- a system that diminishes sentencing disparity -- *depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction.* That determination is particularly important in the federal system where crimes . . . *can encompass a vast range of very different kinds of underlying conduct.*" United States v. Booker, 543 U.S. 220, 250-51 (2005) (emphasis added)(quoting 18 U.S.C. § 1951(a)). "Relevant conduct" under the Guidelines, moreover, allows a court to consider:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

U.S.S.G. § 1B1.3(a)(1). The defense acknowledges that Mr. Johnston's sentence for a Class B  misdemeanor is not predicated on the Sentencing Guidelines.  But the fundamental premise remains that the conduct of unconnected, unknown rioters at the Capitol that day cannot be ascribed to Mr. Johnston, *who was not even charged with rioting*.  It must instead be based on the "real conduct that underlies" the misdemeanor offense. See Booker, 543 U.S. at 250-51.

unnamed individuals in its sentencing memorandum in attempt to connect Mr. Johnston to these other individuals in justification of jail time for Mr. Johnston. That is not justice.

The Pre-Sentence Investigation Report (PSR) similarly opens the Offense Conduct section with eight general paragraphs about the unlawful activities which transpired on the Capitol on January 6, 2021. See PSR at ¶¶6-12. The PSR speaks of "certain individuals" "forc[ing] their way through, up, and over the barricades," id. at ¶10, and of individuals who "forced entry into the US Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts." Id. at ¶11. These assertions are not characterized as background; they are instead set forth as part of the "Offense Conduct," even though Mr. Johnston did not force entry into the Capitol, did not break a window, did not assault anyone or assist anyone in committing such acts. The defense objects to any ascription of these background facts to Mr. Johnston. To be sure, as the Pre-Sentence Investigation Report reveals, *the offense conduct attributable to Mr. Johnston spans only two paragraphs and four whole sentences*, wherein Probation simply recounts:

> 13. *On January 6, 2021, David Johnston traveled from Charleston, South Carolina to Washington, D.C. with his neighbor, Chadwick Clifton, to participate in the Trump rally.*
>
> 14. *Defendant Johnston went to and entered the Capitol building on January 6, 2022. At approximately 2:23 p.m., [h]e entered the Capitol through the Senate Wing doors. Defendant Johnston then went to the Crypt and Visitor's Center, and exited the Capitol through the same doors of entry.*

Id. at ¶¶13-14. There is nothing more to the Offense Conduct. Mr. Johnston has no criminal history, has no mental health or substance abuse problems, and even self-reported the instant offense to the South Carolina Bar and voluntarily consented to the suspension of his license in the wake of these charges.

Incredibly, the Government insists on incarceration time to be served in a curiously tailored manner, suggesting that the Court impose the incarceration in three "14-day installments" wherein Mr.

Johnston would have to serve each stint in solitary confinement.[3]  This bald recommendation to tailor

incarceration time so as to force three stints of solitary confinement for a non-violent misdemeanor

offense smacks of excessiveness and overreach.[4]

To justify its recommendation for incarceration, the Government grossly exaggerates the import

Mr. Johnston's actions by repeatedly referring to him as a "rioter," as described *supra*.  The Government

similarly exaggerates Mr. Johnston's role in the following other problematic and unsubstantiated ways:

- Stating, without any basis or evidentiary support, that Mr. Johnston "*likely* video recorded[] several violent clashes between rioters and law enforcement[.]" Government Sentencing Memorandum at 1 (emphasis added).

Absent any evidence that Mr. Johnston took any such videos, the defense objects to this and similar

unsupported statements speculating that Mr. Johnston took videos of violent clashes.  The defense

urges the Court to reject these speculative statements as an unsubstantiated overreach.

- Stating that Mr. Johnston "entered the Capitol building about 10 minutes after it had been breached by force, *while others around him* climbed through broken windows and broken glass[.]" Id. at 2 (emphasis added).

In so stating, the Government boldly attempts to ascribe the more disruptive and criminal actions of

others (who broke and climbed through those windows) with the much more subdued actions of Mr.

---

[3] As the Bureau of Prisons (BOP) Quarantine Guidance makes clear, "The following inmates should be placed in quarantine: new admissions to a BOP facility[.] . . . Duration of Quarantine is 14 days." See BOP Quarantine Guidance, attached hereto as Exhibit A.  The BOP further lists housing options for quarantine, with priority given to housing "[s]eparately, in single cells with solid walls and solid doors that close fully." Id.  This housing description is, in essence, solitary confinement.  It is no coincidence that the Government seeks that Mr. Johnston's incarceration of 42 days "be served intermittently in 14-day installments," Government Sentencing Memorandum at 1, so as to keep Mr. Johnston in solitary as punishment for his misdemeanor offense.

[4] While the length of the recommended solitary sentence (42 days) is not typically associated with Eighth Amendment challenges given its relative shortness as compared to other more prolonged stints in solitary confinement, courts considering conditions of confinement are guided by "evolving standards of decency that mark the progress of a maturing society." Rhodes v. Chapman, 452 U.S. 337, 346,  (1981). Accordingly, the use of solitary confinement as a valid penological tool remains subject to Eighth Amendment scrutiny. Sheley v. Dugger, 833 F.2d 1420, 1428-29 (11th Cir. 1987) (citing Hutto v. Finney, 437 U.S. 678, 686 (1978)).  Here, the curious recommendation that the incarceration be served in three intermitted 14-day installments – for a misdemeanor offense – calls for additional scrutiny, even if it would not rise to the level of an Eighth Amendment violation.

Johnston, who was photographed simply walking, standing, giving a thumbs-up sign, and shaking an officer's hand before departing.

- Stating that Mr. Johnston "*video recorded or photographed* a confrontation between rioters and police officers in the Visitor's Center, yet failed to leave the area (or building) until officers *corralled* him out[.]" Id. (emphasis added).

Again, there is no actual evidence that Mr. Johnston video-recorded or photographed any "confrontation" or was "corralled" out by officers.[5]  To the contrary, Mr. Johnston did not display or post any videos or photographs of the event, unlike many other individuals charged in connection with the events of that date.

- Stating that Mr. Johnston "failed to take responsibility for his actions by referring – in both a podcast and written journalism – to this as a "politically charged matter," despite being educated in the law and fully aware that such conduct was illegal[.]"  Id.

This overly broad assertion is disturbing in many respects.  First, it attempts to criminalize Mr. Johnston's observations that the events of January 6th were a "politically charged matter."  Even if one disagrees with this observation, it cannot now be said that such language constituted "bragging," or was salacious or inciting in any degree.  Plus, an "educat[ion] in the law" does not deprive one of the right to form or express political opinions. The Government seems to suggest that Mr. Johnston is not entitled to possess or express the opinion that the events were "a politically charged matter," a position which is plainly unconstitutional.  Second, the Government intentionally omits the verbal context in which Mr. Johnston's "politically charged matter" statement is embedded.  Mr. Johnston was responding to a question as to why he consented to the interim suspension of his law license when such a suspension is typically not required for a misdemeanor charge, and answered that he consented because did not wish to place the South Carolina Bar in the untenable position of having to navigate such a "politically

---

[5] This incident cannot even be described as a "confrontation."  A group of officers asked for everyone's attention and indicated that there had been "shots fired" and directed people to leave.  Most of the people, including Mr. Johnston, listened to the officers' directives.

charged matter." Mr. Johnston was not opining on the facts of his criminal matter and was not in any way failing to take responsibility for his actions. His behavior in this regard revealed quite the opposite: his voluntary consent to the interim suspension of his law license actually reflects his taking responsibility for his actions. Such innocuous verbal context for these statements is curiously omitted from the Government's brief. Third, these statements should not interfere with an assessment of his acceptance of responsibility because Mr. Johnston's comments were general in nature and did not concern the facts of his case. Moreover, the expression of an opinion that the events of January 6th were "politically charged" is not antithetical to exhibitions of remorse and should not be viewed as such. Indeed, the Government later contradicts their own exaggerated assertions by recognizing that Mr. Johnston "appears to have taken responsibility for his actions by pleading guilty, which demonstrates an acceptance of responsibility." Id. at 22.

- Stating that Mr. Johnston "counseled his co-defendant in attempt to avoid consequences after January 6." Id.

The Government seems to equate this conversation as some type of obstruction of justice, but it is anything but. In an exchange with Mr. Clifton, during which Mr. Johnston counsels him to say nothing to the Government, Mr. Johnston is clearly providing informal legal advice to his neighbor, three months before charges were brought against them. Indeed, right after counseling Mr. Clifton not to say anything, he informs Chad of the procedure wherein the Government would typically draft an "immunity agreement" before anyone agrees to assist the Government. See id. at 16 (quoting entire text). Mr. Johnston goes on to state that "one never utters a syllable before the agreement is in place." These informative statements, properly viewed in context, do not amount to any obstruction or avoidance of responsibility.[6] Any attempt to characterize this language as obstructive is an intentional

---

[6] Context is particularly important considering that Mr. Clifton's supervisor fired Mr. Clifton after federal law enforcement agents visited his office. Mr. Clifton's supervisor later advised him that he could retain his job if he spoke to FBI agents and he was cleared. Being able to retain his job is the context that Mr. Clifton sought legal advice from Mr. Johnston.

obfuscation of the plain language of the text message exchange, where one party happens to be an attorney familiar with legal proceedings and immunity deals.

Unfortunately, these myriad unsupported and indisputably exaggerated claims by the Government in a formal sentencing memorandum to this Court are designed to inflame, not inform.

The video screen shots and photographs included in the Government's Sentencing Memorandum similarly do not provide any evidence that Mr. Johnston was engaged in any violent or destructive behavior.  Indeed, some of the photographs included in the brief do not even depict Mr. Johnston.  See id. at 10.  Other of these photographs and images do establish, however, that Mr. Johnston's behavior at the Capitol on that day was subdued.

B.  Mr. Johnston is an Otherwise Law-Abiding Citizen Who Remains Remorseful for His Actions and Fully Accepted Responsibility; As Such, Incarceration Is an Extreme and Unjustified Remedy.

The Government asserts, without citing to any case law or statute, that the Court should look at nine factors in evaluating Mr. Johnston's individual conduct.  See id. at 20-21.  While *five of the nine factors* in the Government's self-created 9-factor test concern the existence or absence of violence, destruction of property or destruction of evidence, the Government then paradoxically asserts (again, with no authoritative citations), that "[t]he absence of violent or destructive acts on the part of the defendant *is therefore not a mitigating factor in misdemeanor cases*."  Id. at 21 (emphasis added). Respectfully, this makes no sense.  Setting aside the fact that the Government's 9-factor test is made up (and self-serving in its application of 5 of the 9 factors), application of their own test virtually compels a probationary sentence in Mr. Johnston's case.  He walked into the Capitol building without breaking anything or touching anything or anyone or yelling at anyone.  He spent a total of 30 minutes inside the Capitol, before leaving, again without incident.  He did not engage in any violence or encourage violence, he did not engage in any acts of destruction or encourage destruction, he did not incite or spur

10

on or encourage any acts of violence or destruction, he did not destroy evidence, he made no statements on social media, he cooperated with law enforcement officials, and demonstrated and continues to demonstrate sincere remorse for his actions.

The gravamen of the Government's argument is that Mr. Johnston, as a practicing attorney, should have known better. This argument, however, relies on speculation that Mr. Johnston participated in riotous behavior and bore witness to countless criminal acts. The record is devoid of any evidence revealing that Mr. Johnston bore witness to and/or ignored violent and destructive criminal acts; the Government simply claims that he was nearby, or in close proximity to, or should have seen or "would have heard" of such criminal acts. See, e.g., Government Sentencing Memorandum at 15 (speculating as to what Mr. Johnston "would have" seen or heard without pointing to any actual facts); see also id. at 21 ("Johnston had a front row seat to violent interactions between law enforcement and rioters, and he appeared to be videoing these altercations"; and was "front and center" when law enforcement deployed warnings)(emphasis added). The utilization of pithy conclusory phrases such as "ha[ving] a front row seat" and being "front and center" is dangerous and misleading, lacking the specificity and diligence required by Executive Branch representatives of the United States. Indeed, having a "front row seat" to violent interactions, absent any specific details to support these claims, cannot justify an incarceration sentence for misdemeanor offense conduct. The Government should be required to proceed with the proverbial scalpel, not a sledgehammer.

The comparison cases cited by the Government in support of incarceration are inapposite. Indeed, the Government seems to hand-pick certain facts of three other defendants to support its claim that Mr. Johnston was just like them. Citing the unpublished cases of United States v. Lanvin, United States v. Servisto, and United States v. Pham, the Government attempts to assert that Mr. Johnston and these defendants "share common attributes," thus seemingly justifying incarceration in this case. See Government Sentencing Memorandum at 32. The Government, however, conveniently glosses over the

facts that Pham "*initially denied entering the Capitol*" when speaking to the FBI, id., and that Lanvin
"*minimized her involvement in the riot . . . when interviewed by law enforcement agents.*" Id. at 30
(emphasis added). Mr. Johnston, by contrast, did no such things. But the Government nevertheless
egregiously misstates and exaggerates Mr. Johnston's role in the offense to make its incarceration
argument more palatable, claiming – without any evidentiary basis – that Mr. Johnston "*recorded an*
*altercation between law enforcement and a rioter inside the building, witnessed and likely recorded*
*elongated violent clashes on the West side of the Capitol before entering, was present to hear the LRAD*
*warnings, bragged about breaking past barriers, and failed to take responsibility for his actions by*
*turning himself in.*" Id. (emphasis added). None of these claims is supported by the record evidence
(unlike Mr. Johnston's handshake with a law enforcement officer before departing the Capitol which
was captured on film), and thus this argument may properly be characterized as careless at best and
inconsistent with the exacting standards required of Executive Branch officials.

　　　　To the extent this Court wishes to compare the behavior of Mr. Johnston with other defendants
charged on January 6th, it is more useful to examine the sentences meted out by this Court. To place
this case in proper perspective, here the Government is seeking twice the amount of incarceration time
than Your Honor imposed in United States v. Carson Lucard, where defendant Lucard entered the
Capitol twice, accessed Senator Merkely's Office and flipped over a cabinet, yelled and chanted at
police, went to the Crypt and posed for a selfie. In United States v. James Lollis, this Court imposed a
sentence of 3 years' probation, 3 months' home detention and 100 hours of community service where
Lollis had harassed police, had earlier possessed a firearm, stuck a "fuck Antifa" sticker on the doorway
in the Capitol and later texted "hang that bitch" about Speaker Nancy Pelosi. In United States v. Samuel
Fox, this Court sentenced Fox to two months' home detention, three years' probation and a $2,500 fine
where defendant Fox took selfies inside the Capitol, engaged in extensive preplanning to go to the
Capitol and wrote on Facebook about his wish for then President Trump to start a civil war, spread

12

demonstrably false information about the riot by stating that nothing violent happened there other than a black officer murdering a white woman.  In declining to impose jail time, this Court reasoned that Fox possessed no weapons, no tactical gear, no bear spray, and did not engage in any police interaction.  An evaluation of Mr. Johnston's more subdued behavior in this greater context of January 6 defendants who have appeared before this Court compels the imposition of a non-custodial sentence here.

Mr. Johnston, however, remains deeply remorseful for the actions he undertook which placed him in proximity of these events and put him in the Capitol on that date at that time.  He regrets his decision to travel to Washington and wishes that he exhibited better judgment when he agreed to travel to the Capitol with his neighbor and when he walked onward into the Capitol instead of turning away. He has spent countless hours reflecting on his actions and has continued his lifelong commitment to serving his community, not only as recompense for the general harm suffered on January 6th, but to signal to his family, friends and colleagues that he has and will continue to learn from his mistakes.

But the defense urges the Court to place these actions in proper context: Mr. Johnston is a sixty-six year old individual who still recalls the peaceful protests of the 1960's, the sit-ins, the affirmed right to peacefully assemble to support a cause, unpopular as that cause might have been.  His appreciation of the right to assemble is a product of his upbringing in the 1960's, when he was a young teenager.  He went to law school to practice law, not to trample on its foundation.  That Mr. Johnston was caught up in events for which he did not anticipate, he remains steadfastly sorry.  But he does not deserve jail time for his lapse of judgment.  He has no criminal history.  Incarceration as a deterrence is not warranted here; this conduct will not ever be repeated and Mr. Johnston will spend the rest of his life regretting his decision.

Mr. Johnston has several supporters who can speak to his otherwise impeccable character.  He currently serves as a Deacon at his local church, is a long-time resident of South Carolina with stable

community ties and steady, full-time employment.  The pastor of Scots Kirk Presbyterian Church in

Summerville, South Carolina, where Mr. Johnston was ordained as a Deacon, writes to the Court:

> [David] really goes out of his way to get to know church members and visitors to help
> them personally.  He regularly makes the time to visit members who are sick or ill in the
> hospital. Many of our members have gone to David for legal advice. He gives sound
> advice and helps people handle things with minimum conflict.  He is also handy and
> frequently brings his tools to help members fix things in their own homes.[7]

His godson, M. Taylor Jones, writes that David "provided disciplined guidance which kept [him]

and [his] brother away from drugs, alcohol, and the criminal mischief that played 1990's era Charlotte,

NC."  David encouraged his godson to apply to the Virginia Military Institute where he graduated in 2001

before joining the military and serving overseas in Iraq.  Mr. Jones recounts that David carved out his

work schedule so he could "be home in time to have dinner with [his kids] every single day."

Family friend Allison Carr indicates that "David Johnston is a good man, a good lawyer and a

good husband and father to his children.  He participates in doing free legal work for the less fortunate

in his community."  Another of David's friends, Clement Arsenault, confirms that David "routinely"

performed pro bono legal work for others in the community, usually of lower to middle income

individuals who could not afford more costly legal consultations.  These and other letters of support

confirm what Probation independently observed: that the misdemeanor offense was a glaring outlier in

the community-oriented, family-focused and law-abiding life of David Johnston.

### C.   Probation's Sentencing Recommendation Reflects a More Careful Balancing of the Sentencing Factors in Mr. Johnston's Case.

As Probation concludes in its sentencing recommendation, "Mr. Johnston's culpability appears

to be minimal in contrast with rioters who destroyed or stole government property and assaulted or

threatened the law enforcement officers on that date."  Having also considered Mr. Johnston's age (66

---

[7] This and several other letters recommending leniency are attached hereto as <u>Exhibit B.</u>

years old), lack of criminal history, stable familial history and lack of substance abuse problems,

Probation recommends "a sentence consisting of a term of 12 months' probation with the special

conditions of supervision requiring the payment of restitution, payment of a fine, financial disclosure,

and a firearm restriction during the term of supervision."  Probation further opines that "[w]ith respect

to deterrence, community safety (incapacitation), and punishment, Mr. Johnston does not appear to

present a danger to the community and goals of sentencing may be accomplished through a non-

custodial sentence of probation supervision which would enable him to continue working to support

himself."  Probation further concludes that "[r]ehabilitation does not appear to be a particular concern

for this defendant."  The defense wholeheartedly agrees with Probation's more balanced assessment of

this matter.

### III.        CONCLUSION AND SENTENCING RECOMMENDATION

Based on the foregoing, including a careful consideration of the factors under Section 3553(a)

pertinent to Mr. Johnston and his individualized offense conduct and the recommendation of U.S.

Probation, the defense respectfully requests that this Court sentence Mr. Johnston to a non-custodial

sentence of twelve months' probation, with the special conditions of supervision requiring the payment

of the agreed-upon restitution, payment of a fine, financial disclosure, and a firearm restriction during

the term of supervision.

Respectfully submitted,

*/s/ Christopher J. Gramiccioni*
Christopher J. Gramiccioni

c. Ashley Akers, Trial Attorney

# Exhibit A

## BOP QUARANTINE GUIDANCE:
## NEW ADMITS, CONTACTS OF COVID-19, AND PENDING RELEASE

### DEFINITIONS

- **QUARANTINE** in the context of COVID-19 refers to separating (in an individual room or unit) asymptomatic persons who may have been exposed to the virus to **(1)** observe them for symptoms and signs of the illness during the **INCUBATION PERIOD** and **(2)** keep them apart from other incarcerated individuals.

- **CASE** refers an individual who has a positive test for COVID **OR** who has symptoms consistent with COVID-19, but has not yet been tested.

- **CLOSE CONTACTS:** In the context of COVID-19, an individual is considered a close contact if they have:
    - ➤ Been within 6 feet of a COVID-19 case for a prolonged period of time **OR**
    - ➤ Had direct contact with infectious secretions of a COVID-19 case.

  Considerations when assessing close contacts include the duration of exposure and the clinical symptoms of the person with COVID-19 (i.e., coughing likely increases exposure risk as does an exposure to severely ill persons).

- **COHORTING** refers to housing inmates together rather than in single cells.

### INDICATIONS FOR COVID-19 QUARANTINE

**The following inmates should be placed in quarantine:**

- Close contacts of a suspected or confirmed case of COVID-19
- New admissions to a BOP facility
- Inmates returning from the community to a BOP facility after a potential exposure (e.g. an extended time in an emergency department or crowded waiting area, residing overnight in the community or alternative setting including hospitalization, furlough, writ return, etc...).
- Inmates being released back into the community (residential reentry center, home confinement, or full-term release), prior to their release.

➔ *See* [ (b)(7)(E); (b)(7)(F) ] *below for information specific to Routine Intake Quarantine and Inmate Quarantine Prior to Release/Transfer.*

### IDENTIFICATION OF QUARANTINE ROOMS

#### GENERAL GUIDANCE ON QUARANTINE HOUSING

- ➔ *To reduce the risk of transmission while in quarantine, facilities should make every effort to quarantine inmates INDIVIDUALLY in cells with solid walls and doors.*
- Cohorting should **ONLY** be practiced if there are no viable options to house them individually.
- Ideally, do **NOT** cohort individuals who are at higher risk of severe illness and mortality from COVID-19, including persons 65 and older or with certain co-occurring conditions.

- → *See the CDC's guidance "People Who Are at Higher Risk for Severe Illness" at:*
  *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html*
- If an entire housing unit is under quarantine due to contact with a case from the same housing unit, the entire housing unit may need to be treated as a cohort and quarantine in place.
- At Medical Referral Centers (MRCs), the facility's quarantine area for COVID-19 should be in a separate area from the medical units (Nursing Care Center [NCC] units, ambulatory care units, etc.), whenever possible.
  - ➤ MRC transfers that need to be quarantined on a medical unit due to care level for other medical conditions should be quarantined in a single room with solid walls and door, placed on droplet and standard transmission precautions with full COVID-19 PPE worn by staff when entering the room. Donning and doffing PPE appropriately and practicing hand hygiene is critical. To the extent possible, staff interventions with the inmate in quarantine should be limited.
- Consider low-census housing units, old SHU areas, or areas such as the visiting room, gym, chapel, education, Unicor areas for potential quarantine space, or climate-controlled tents.

## CDC GUIDANCE ON QUARANTINE HOUSING

### CDC guidance lists options for housing inmates in quarantine—in order of preference from top to bottom:

- Separately, in single cells with solid walls and solid doors that close fully.
- Separately, in single cells with solid walls, but without solid doors.
- As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions.
- As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a solid door.
- As a cohort, in single cells without solid walls or solid doors, preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals.
- As a cohort, in multi-person cells without solid walls or solid doors, preferably with an empty cell between occupied cells. Employ social distancing strategies.
- As a cohort, in the individuals' regularly assigned housing unit, but with no movement outside the unit. Employ social distancing strategies to maintain at least 6 feet of space between individuals. Place beds head-to-foot instead of head-to-head to create more space.
- Safely transfer to another facility with capacity to quarantine.
  - → *Transfer should be avoided due to the potential to introduce infection to another facility; proceed ONLY if no other options are available.*

## QUARANTINE PROCEDURES

- **ADMISSION TO QUARANTINE:**
  - → *When an inmate is identified as requiring quarantine, the Health Services Administrator, or designee, will contact the Chief Psychologist to request consultation. Refer to:*

    (b)(7)(E); (b)(7)(F)

  - ➤ An **INMATE** being moved to quarantine should wear a surgical mask.

- ➤ **ESCORTING STAFF** should wear gloves, surgical mask, and face shield or goggles.
- **DURATION OF QUARANTINE** is 14 days.
  - → *If quarantined as a **COHORT**, the 14-day quarantine period must be reset to zero if an inmate in the cohort becomes symptomatic or new inmates are added to the quarantine.*
- **DOOR SIGNAGE:**
  - ➤ The door to the quarantine room should remain closed.
  - ➤ A sign indicating "**Quarantine Precautions**," listing the recommended PPE, should be placed on the door.
    - → *See **Attachment** for a printable sign. See the **Quarantine Checklist** for specific guidance about what to post.*
- **RECOMMENDED PPE FOR STAFF** interacting with asymptomatic inmates in quarantine:
  - ➤ **DIRECT, CLOSE CONTACT (LESS THAN 6 FEET APART):**  Wear surgical mask, eye protection, and gloves. In addition, a gown should be worn when taking temperatures, performing assessments, or providing medical care (i.e., whenever direct contact is anticipated with the inmate).
    - → *These recommendations apply to staff entering individual or double-bunked cells or cohorted living areas, **AND** when interacting through non-solid doors (i.e., bars) whenever the staff person is within 6 feet of the inmate.*
  - ➤ **IN THE SAME ROOM, BUT NOT IN CLOSE CONTACT (6 FEET OR MORE APART):**  Wear surgical mask, eye protection, and gloves.
    - → *This includes activities such as dropping off food trays and performing inmate counts in open bay situations, and opening doors to quarantine rooms or units.*
  - ➤ **NOT IN DIRECT CONTACT (INTERACTION THROUGH THE SLOT OF A SOLID DOOR):**  Gloves only.
    - → *This includes passing medication and food trays through the slot in a solid door.*
    - → *When there are critical shortages of PPE, refer to the CDC's recommendations for alternative PPE strategies at https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/index.html.*
- **FACE MASKS OR COVERINGS FOR INMATES:**
  - ➤ **Cohorted quarantine:**  To minimize the likelihood of disease transmission, inmates quarantined as a cohort for close contact with a COVID-19 case should be required to wear a surgical mask covering routinely.  Surgical masks should be replaced as needed.
  - ➤ **Staff protection:**  When housed in a single cell, inmates should apply a surgical mask covering whenever staff enter the room.
- **PLACEMENT OF BEDS IN COHORTED QUARANTINE:**  As feasible, the beds/cots of inmates quarantined as a cohort should be placed at least 6 feet apart. Consider alternating head-to-foot sleeping position, if feasible.
  - → *See CDC Guidance on Quarantine Housing above.*
- **MONITORING:**  Inmates in quarantine should be screened twice daily for COVID-19 symptoms, including subjective fever and taking a temperature reading.
  - ➤ **Inmates who become symptomatic need to be isolated.**
  - ➤ **Inmates who are quarantined for 14 days prior to community release** may have a symptom screen and temperature check once daily—if there are no COVID cases at the institution.

- **MEALS:** Meals should be provided to quarantined individuals in their quarantine spaces.
  - ➤ Cohorted inmates may be allowed to go as a group to meals, but only when they can eat separately as a group and should maintain social distancing when doing so. They should wear surgical masks while they are out of the quarantine area. The area must then be cleaned and disinfected prior to others eating in the same area.
  - ➤ Disposable food service items can be disposed of in regular trash. Individuals handling used food service items should wear gloves and wash their hands after their removing gloves. Dishes should be washed in hot water.
- **LAUNDRY:** Laundry from quarantined persons can be washed with other inmate laundry.
  - ➤ Individuals handling laundry from quarantined persons should wear disposable gloves, discard them after each use, and then clean their hands after.
  - ➤ Dirty laundry should not be shaken, so as to minimize the possibility of dispersing virus through the air.
  - ➤ Launder items using the hottest appropriate water setting and dry items completely.
  - ➤ Clean and disinfect clothes hampers according to guidance for cleaning surfaces posted on Sallyport. If permissible, consider using a bag liner that is either disposable or can be laundered.
- **RESTRICTIONS ON MOVEMENT:** To the extent possible, quarantined inmates should be restricted from being transferred, having visits, or mixing with the general population.
  - ➤ **Recreation:** Inmate recreation will be suspended while on quarantine.  The institution will provide other means for inmates to occupy their time such as reading materials, educational materials, etc.
  - ➤ **Telephone privileges** may be afforded to inmates in quarantine only when the CDC/BOP sanitation procedures can be adhered to. Social distancing needs to be maintained during phone use and phones need to be cleaned and disinfected after each use.
  - ➤ **Staff should be assigned to one post only**, to the extent possible, to limit staff movement among different inmate populations / units at the institution.
- **For inmates quarantined in a SPECIAL HOUSING UNIT (SHU):**
  - ➤ Special Housing Units are a modified form of **ADMINISTRATIVE DETENTION**.  Refer to *Program Statement 5270.11, Special Housing Units*, for specific procedures to follow.
  - ➤ Staff will complete electronic or paper form-292 according to policy for each inmate for the duration of the quarantine

## ADDITIONAL PROCEDURES RELATED TO SPECIFIC TYPES OF QUARANTINE

- **ROUTINE INTAKE QUARANTINE:  With community spread of COVID-19 throughout the U.S., the BOP requires a 14-day quarantine of all new admissions and all returns to a BOP facility** (new commitments, inmates returning from writ, voluntary surrenders, U.S. Marshals Service, Justice Prisoner and Alien Transportation Service, Customs and Border Patrol, and Immigration and Customs Enforcement). Some same-day returns to a facility may not require quarantine.
  - ➔ *Routine intake quarantine applies so long as these individuals are asymptomatic and have no known exposure to a COVID-19 case.*
  - ➤ **To prevent possible transmission, these inmates should be housed separately from individuals who are quarantined due to contact with a COVID-19 case.**

➤ If not housed in a single cell, individuals under routine intake quarantine should wear surgical masks.

➤ If at all possible, do not add more individuals to an existing routine intake quarantine cohort after the 14-day quarantine has started, so as to avoid resetting the quarantine period back to day 1.

➤ Institutions should attempt to coordinate movement with other agencies and correctional systems on a 14-day cycle, when possible, as a way to simplify routine intake quarantine procedures.

- **INMATE QUARANTINE PRIOR TO RELEASE/TRANSFER:**

  ➤ **All inmates releasing or transferring from BOP facilities to the community will be placed in quarantine or be required to "shelter in place" for the 14 days immediately prior to their release/transfer.** This includes but is not limited to Full Term Releases, Good Conduct Time Releases, Detainer Releases, Furloughs, and Transfers to Residential Re-entry Centers/Home Confinement.

    ▪ In institutions where there are active cases of COVID-19, releasing inmates should be placed in **quarantine** for the 14 days prior to release; ideally, they will be housed individually or cohorted separately from other quarantine groups.

    ▪ In institutions where there are no active COVID-19 cases, releasing inmates may "**shelter in place**" for the 14 days prior to release.

  ➤ **Inmates pending release or transfer, as described above, should have a temperature check and symptom screening daily**, assuming no known or suspected COVID-19 exposure for the 14 days prior to release or transfer. A screening and temperature check should be noted in the release paperwork on the day of release from the facility.

  ➤ Asymptomatic inmates should undergo COVID-19 testing resulting with negative findings prior to being released from quarantine.

➔ *Refer to:*

| (b)(7)(E); (b)(7)(F) |
|---|

*Version 1.1; 5/20/20*

# Exhibit B

Chief Judge Beryl Howell
District Court for District of Columbia
333 Constitution Av, NW
Washington, DC 20002

Dear Judge Howell,

I met David Johnston back in 1997. We quickly became friends and have stayed friends ever since.

We learned to rely on each other, as friends do. When I needed things fixed around my house or to have something pressure washed, he would take care of it. We gave each other rides to work during times of car trouble. Over the years as some friendships fell away, ours lasted. Each of our lives have taken both ups and downs, but we found we could always rely on each other. Realizing that our friendship had grown into something stronger, we married in 2014.

David has always been ready to help others: simple car repairs, home repairs, simple plumbing problems, hanging lights or pictures, to even chopping trees; and of course legal help (up until recently). He helps our friends, helps our church family members, and helps the church grounds and facility. He's also been known to help clients on occasion.

David is a dedicated familyman. He takes his responsibilities to the kids seriously. He helps with the homework and the school projects and the school events, etc. He also does fun activities with them like boating and little day excursions.

In the days immediately following the heartbreaking events at the Capital, as the videos of the violent clashes began to play on the news, it affected him deeply. I truly don't believe if he'd known about the way some areas would erupt in violence that he would have gone. He was shocked to see it, as we all were.

He regrets going and he regrets going inside. He takes full responsibility for his actions.

I hope you will see fit to be lenient to him and our family, this has been a difficult road.

Sincerely,

Mrs Shelly Johnston

Shelly Johnston

Matthew Taylor Jones
I
Abu Dhabi, UAE

Chief Judge Beryl Howell
District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

December 6, 2022

Dear Judge Howell,

I am writing on behalf of my Godfather, David Charles Johnston. I hope to shed greater light into his character and especially into the huge impact he had on my life.

David is known to me and my family as "Uncle Barney". When I was a kid, he stepped up and filled in like a family member when my own father succumbed to his addiction to drugs and alcohol. From about the time I was 10 years old, Uncle Barney was the sole male parental figure in my life and he helped my single Mom raise my brother, sister, and me.

It is impossible to put into words the fatherly impact Uncle Barney had on our lives. As most single Moms experience, money was always an issue during the holidays. Uncle Barney stepped up and bought presents and holiday meal items for us as he was able. During holidays, birthdays, any special occasion, Uncle Barney was there for us to the best of his ability, constructing bicycles and playsets while we slept on Christmas Eve, bringing Easter gifts, appearing at birthday parties, graduations...

Kids tend to fall astray from the direction a single mother. But Uncle Barney filled that void, straightening us up as much as he could. He provided disciplined guidance which kept me and my brother away from drugs, alcohol, and the criminal mischief that plagued 1990's era Charlotte, NC. He warned us about the dangers of drugs and alcohol. He mentored us by demonstrating what could be achieved through a hard work ethic in school and after-school jobs. Through his graduation from law school and consistent perseverance to become an attorney, Uncle Barney showed me nothing is impossible.

I was a tough teenager filled with anger and a spark away from a very bad life. But Uncle Barney encouraged me to avoid bad things and consider the military as a career. He bought me a book that captured my imagination; a book about US Navy SEALs in the Vietnam War titled "The Men With Green Faces" by Darryl Young. This book, partnered with his mentorship and direction, gave me a goal and kept me on track and away from poisonous things my peers were doing. I worked hard and got into Virginia Military Institute where I graduated in 2001.

Uncle Barney reinforced my schooling with education about being a faithful leader, how to manage pride, being disciplined with money, and the need to continue learning. In some ways, we may have

been teaching each other because in 2004 our paths crossed in Baghdad, Iraq where my Uncle Barney volunteered to work with organizations playing a decisive role in restoring that country. Uncle Barney and I worked in two companies together in Iraq, Chameleon Security and American-Iraqi Solutions Group.

In Iraq, Barney found his second professional calling (his first being a Lawyer). I was able to witness his passion for the Iraqi people in how he argued with US Military Advisors on the best and most effective way to deliver reconstruction supplies to contested areas within Anbar Province. He was never afraid to go into hostile areas and traveled "red zone" Iraq extensively. Barney was never influenced by money, or a promotion. Uncle Barny was authentically passionate about what he could do for the Iraqi people while upholding his integrity to the highest standards. I witnessed my godfather living out the morals and values he instilled in me years earlier.

I remember when Barney felt that his time in Iraq was over; once the military began to draw down. He decided to go back to Charleston, SC where he got married. Over the span of four years he became a father to two beautiful and strong children. His first wife left, but Uncle Barney remained with his kids and raised them effectively by himself for several years, struggling as a single Dad the way I saw my Mom struggle as a single Mom. He never complained.

I watched Uncle Barney conquer obstacle after obstacle, becoming a Realtor and then a South Carolina attorney. Throughout that time, Uncle Barney prioritized his children. He has taught them the same values he taught my brother, sister, and me. Eventually, he became an Attorney and I think he's a very good attorney.

Instead of opening his own practice, Uncle Barney chose to work for a practice with set hours where he could go home in the afternoon and be with his kids. I asked him several times why he remained there instead of opening his own practice, and his response was typical of the Uncle Barney that helped raise me. "Because I know I can get the kids to school in the morning, and be home in time to have dinner with them...every single day".

Uncle Barney told me about 06 January and what he did that day. He regrets it deeply and is deeply embarrassed and ashamed.

My Uncle Barney is much more than this one regrettable incident. Please consider the influence he has had on me, my siblings, his own children. People close to him rely on his mentorship, guidance, leadership, and passion. I believe that if you are to ask him if he understands what he did on 06 January 2021, he will respond truthfully and with tremendous regret. Please also consider the good he has done as a father, a husband, a lawyer, and his forever inspiration to me.

Sincerely,

M. Taylor Jones

Fred Biggers

Concord, NC 28027

December 7, 2022

The Honorable Judge Beryl Howell
District Court For The District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Howell:

David Johnston and I have known each other for many years. We met while in law school. I was surprised and saddened to learn that David attended the January 6 event in DC. When I learned that he had been charged, I was shocked. I believe David is a good person who highly values our Constitution, legal system, and the rule of law. I think his actions at issue are inconsistent with his core values.

I am convinced that David is a dedicated family man with a deep love for his wife and children. I think David is, and has been, very involved in their lives. I presume that his wife and children are dependent on him in many areas of daily life, including financial support.

In conclusion, I think David's mistake weighs heavy on him. I feel that he deeply regrets his actions on Jan 6 which are at issue. I also believe that he has learned a painful lesson. Lastly, I expect that he will be much more cautious and careful in the future.

Thank you for taking the time to read this letter.

Sincerely,

Fred Biggers



Allison Carr

Bamberg, SC 29003

Chief Judge Beryl Howell
District Court for District of Columbia
333 Constitution Ave., NW
Washington, DC. 20001

12-6-2022

Dear Judge Howell:

My name is Allison Carr and I'm writing on behalf of my family's dear friend David
Johnston.  David told me that he was in the Capitol building on January 2, 2022 and wrongly
went inside.  I understand he pled guilty to Demonstrating in the Capitol and is due to be
sentenced in your court.

My family and I have known David Johnston on a professional and personal basis since
2006.  He was the realtor our family used to buy some investment properties and later sell our
family home.  When he was licensed as a lawyer, we started using him as our family attorney
and our families have also become good friends.

David has been our attorney through some very difficult circumstances.  I cannot
overstress that these were extremely difficult circumstances my family faced.  David stayed with
us every step of the way.  He always took the time to talk with us and help us feel better about

things. He kept in touch with us and explained what was going on. David faithfully kept our confidences. He consistently provided very helpful and effective legal advice. David was sensitive and caring towards us. We trust him completely.

David Johnston is a good man, a good lawyer and a good husband and father to his children. He participates in doing free legal work for the less fortunate in his community. He is a dedicated husband and father to his children as I can attest to the fact that he helps his kids with their unique challenges. My husband and I are parents to a special needs child, so this is something we relate to with David. Professionally, as a lawyer with George Sink, I knew he was the only one in that practice who would take pro-bono cases.

David has deep regret and remorse over his actions that day at the Capitol. We know he feels terrible for being a part of it. Please also take into consideration that he has already suffered greatly as a result of his bad choices on that day, losing a job he enjoyed at George Sink, the suspension of his law license, the embarrassment of the front-page news reports, and the enormous stress on his family. I can tell you that it is not in his normal character to have participated in that event at the Capitol.

You should know that my husband and I are physical therapists and we have had a few patient referrals from David over the years. But this is not why I am writing to support him. His work for our family and his good character are why I am writing. I hope you will consider David Johnston's life and work in your decision. Thank you for taking the time to read this letter to learn more about David Johnston. I am available to confirm any facts in this letter by phone or email.

Sincerely,

Allison Carr



**REMBERT**
**LAW FIRM**

ACCIDENT ATTORNEY

December 7, 2022

Your Honor,

My name is André Rembert. I am a forty-three-year-old attorney from Charleston, South Carolina. I was formerly a Captain in the United States Army, having been stationed in Germany and served as a firebase commander in Iraq in 2004-5. Following law school, I worked as a contractor in Afghanistan.

I have known David Johnston for a decade, having previously worked with him at the largest personal injury firm in South Carolina. David has been, and remains, a diligent, friendly man who is keen to help others. He is jovial, kind, astute, and perceptive. I know him to be a loving husband and father of four. While he has been a great help to me professionally, he is, most importantly, my friend.

I have spoken with David about it and he has expressed deep regrets about January 6th, 2021. I understand he has pled guilty to the misdemeanor associated with entering the Capitol on that day. As an (at least) fourth-generation Army officer, I take, quite seriously, my vow to defend the Constitution of the United States against all enemies, foreign and domestic. While David participated in the events that have led rise to his being before you, I do not believe him to be an enemy of the United States.

It is my humble hope that you will take into account the scope of his life prior to and after that day, which to my knowledge is free from any other criminal blemish, and, understanding that he has been an upright citizen, sentence him with leniency and mercy.

Sincerely,

André DuBose Rembert

PO BOX 20341 • CHARLESTON, SC 29413
WWW.REMBERTLAW.COM • AREMBERT@REMBERTLAW.COM
(843) 779-5688 • (843) 589-1068

Dale C. Johannesmeyer

Summerville SC 29483


December 8, 2022


Chief Judge Beryl Howell
District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001


Re: David C. Johnston


Dear Judge Howell,

As an Elder at Scots Kirk Presbyterian Church, I have known David C. Johnston since September 2017 when he first started attending Scots Kirk. Shortly thereafter, David and his wife joined the Church.

From the very beginning, David has been deeply involved in the ministries of the Church. The Church was just beginning a difficult recovery period resulting from the long-term illness and subsequent death of its Pastor.  There were many needs that were not being met. The condition of the building and grounds were suffering. David personally hired a landscape crew with his own money and cleared out the heavy overgrown underbrush between the trees in a wooded area at the front of our church.  He took it upon himself to facilitate many other necessary repair and maintenance projects.

He also made it a priority to help members and others who needed emotional and physical support due to health and financial difficulties. He visited the sick in the hospital and went to the homes of others to help with their basic needs.  His personal sacrifice of his time and money in order to help in our mercy ministries to the poor and downtrodden was impressive. This included helping homeless who would come to the Church seeking aid.

Seeing his desire to help others, Scots Kirk elected him as an Ordained Deacon in the Church. One year later he was unanimously elected as Chairman of the Diaconate. Since then, he has worked tirelessly to bring a sense of urgency to the mercy ministries, buildings and grounds upkeep, and financial health of the Church. We have seen marked improvement in all since David became involved. For example, he personally worked with the Town of Summerville and contractors to get approval for and procure updated signage and landscaping for the Church. There were many other improvements that only happened through his personal involvement. Also, as Chairman of the diaconate, he oversees the proper handling and accounting of Church

Dale C. Johannesmeyer

Summerville SC 29483

offerings, and management of the Church budget. At this point in time, the financial health of the Church has never been better.

In addition, David serves as a valuable member on our Facilities Improvement Committee, and Evangelism and Outreach Ministry Team. He also volunteers to work with and teach Church youth. He has tirelessly and unselfishly devoted his time, energy and financial support to help the Church and others. He is a true blessing to the Church.

As an attorney, David has provided a significant amount of pro bono legal advice to Church members and has always taken the time to reach out and help. He keeps their problems in strict confidence, helps them avoid conflicts and work matters out without having to burden the courts.

David is father of four well-mannered children.  Two of his children have joined the Church through a Profession of Faith. He has primary custody of his daughter who has had some developmental challenges.  With permission of her biological mother, he sees that his daughter is in church each Sunday.  After seeing that she was struggling in public school, he made a financial sacrifice to enroll her in a private school that could provide her with the support she needed to succeed. I have seen a marked improvement in her behavior and demeanor. His daily involvement with her and his other children makes their lives better and improves their chances of becoming positive contributors to society. He is an example to all as a devoted and attentive father.

As David's Elder, I have been responsible for his spiritual growth and wellbeing, and assisted him in dealing with the difficulties life places before us all. In the time that I have known him I have observed his spiritual growth in his walk in Faith. He constantly strives to be further sanctified before God. He uses the good times to praise God and the difficult times to improve. He is truly a Blessing to our Church.

Sincerely,

Dale C. Johannesmeyer

December 7, 2022

To the Honorable Chief Judge Beryl Howell:

I have known David Johnston since I became pastor of Scots Kirk Presbyterian in Summerville, SC in March of 2019. He joined our church shortly after I was installed as Pastor. Since that time, I have gotten to know him well and worked with him closely as he has taken on increasing responsibility in the church. Since I could not miss his passion and energy for serving others, it was not long before I suggested he become ordained as a Deacon. He was unanimously elected not only as a Deacon but also as the Chairman of that board. In fact, we now affectionately call him the "Freakin' Deacon" because he is known as our go-to guy to "get things done."

What does "getting things done" with David look like? He really goes out of his way to get to know church members and visitors and help them personally. He regularly makes the time to visit members who are sick or ill in the hospital. Many of our members have gone to David for legal advice. He gives sound advice and helps people handle things with minimum conflict. He is also handy and frequently brings his tools to help members fix things in their own homes.

He personally helped me pressure wash my rental house when HOA threatened to fine me because some mold grew on the siding. He also gave my teenage daughter sound legal advice on her gecko breeding business. He helped us when issues arose with my father's dementia care, and then after his death, with legal issues regarding his estate. I know he has done many similar things for others: spending hours doing the heavy lifting and assembly/reassembly when congregants move, taking visitors to the church out to lunch almost every Sunday, helping arrange a place to stay and material provisions for homeless persons that walk through our church doors, and many other acts of service.

As chairman of the diaconate, David oversees weekly collection of offerings, along with proper accounting and depositing of church funds through our treasurer. He has also been invaluable in taking care of our church grounds, which were falling behind. David hired a landscape crew with his own money and cleared out the heavy overgrown underbrush between the trees in a wooded area at the front of our church. After working with the Summerville Town Arborist to identify dead and diseased trees that needed to be cut down, he has spent many of his Saturday mornings cutting down and hauling off trees. There were Bradford Pear Trees growing at the entrance of our church and causing problems (South Carolina declared them invasive). David got them removed and the stumps ground, installing new healthy Palmetto trees afterwards. He got quotes for a new church sign out by the road when the old sign was showing its age. The new sign he got approved and installed looks 100% better. Due to his leadership, the church grounds have never looked better than they do right now.

In addition to his responsibilities as the Chair of the Deacons, David also serves on two church committees: Facilities Improvement and Outreach. He volunteers to teach church youth and take them to retreats and camps, taking several kids in the congregation on fishing/boating outings as well.

David is also a dedicated husband and father. He is an attentive father to four well-mannered children. In particular, he has primary custody of his daughter who has had some developmental challenges. He has her all except two weekends per month. With permission of her biological mother, he sees that she's in church each Sunday. A while back, he saw that she was struggling in public school and so he took her out and found her a private school which has been much better for her – it is obvious to everyone that she is doing much better now.

As his pastor, I know that David is embarrassed and deeply regrets his involvement in the events that occurred on Jan. 6. My experience with "Freakin' Deacon" has made clear to me that the warp and woof of his life is respect for the law and other human beings. I am convinced he is a blessing to others in his community, church and family. Thank you for taking the time to read my testimony concerning his character and service to others as you consider what sentence is appropriate for his case. I am glad to discuss anything further over the phone if you deem it helpful.

Respectfully,

Rev. Jim Mitchell

Pastor, Scots Kirk Presbyterian Church

Summerville, SC 29485

To:   Chief Judge Beryl Howell                             November 25, 2022
        District Court for the District of Columbia
        333 Constitution Avenue, Washington DC  20001

Re:    Sentencing - David C. Johnston, Esq.

Dear Ms. Howell:

My name is Clement Arsenault, of North Charleston, SC.  I am writing this letter on the behalf of Mr. David C. Johnston, Esq., in hope that prior to your determination of his sentencing, you will consider my observations and thoughts regarding Mr. Johnston's actions and character over a +/-20-year period since I met him in approximately 2003.

When I first met David, he was teaching a wood-working class at a local Wood-Craft store, and I hovered close-by to listen-in.  When he finished, I was the first to initiate our conversation, asking questions, and appreciating his free advice.  At that time, I learned that his primary profession was contracting himself and his construction crew for hurricane reinforcement construction on new homes.  We have maintained a close friendship over the past 20 years.  After observing David's professional demeanor and desire to help others, I encouraged him to sell real estate, since I myself am a State Certified General Real Estate Appraiser.  I referenced David to a friend that was a successful realtor, and David worked with him for a time, and did well until the market slowed down around 2007.

As our friendship deepened, I learned that David completed Law School in his youth.  I encouraged him to take the Bar, and pursue some field of law that would allow him to continue to help families and others in need.  I was very pleased that he acted on my advice, passed the South Carolina Bar in his mid-50's, and became a successful and well-respected attorney at the George Sink Law Firm in Charleston, SC.  Everyone that I ever referred to David, subsequently told me that they appreciated the referral, and that he acted professionally and honestly.  Concerning my own professional experience with David, it is noteworthy that he had settled a car-wreck case for my daughter and I, about a week prior to his arrest for the Jan 6 incident.  I was highly satisfied with his performance, professionalism, and integrity throughout the entire legal process.

Soon after David became a lawyer, I found that he was routinely performing "pro-bono" legal work for others in the community, usually of lower to middle income individuals that could not afford expensive legal consultations.  For example, David helped a "long-ago" neighbor of mine who has two adopted special needs children, when one was suspended from school.  I am also aware that David took-on a court appointed pro-bono case in the local community, for economically disadvantaged individuals.  Based on comments from my many professional contacts in the community, I am also aware that David keeps himself "accessible" and often provides pro-bono "advice" for reputable struggling professionals, e.g., realtors, etc., that are blind-sided by legal issues.  He does this as a way of "giving-back" by helping those he feels are truly in a state of crisis in their lives.

I urge you to consider that David is NOT a malcontent law-breaking insurrectionist.  I assure you that his intentions and actions on Jan 6 were those of someone merely attending a political rally, which are customarily fun and festive events.  He did NOT see, expect to see, or otherwise participate in fighting, vandalism, theft, nor other aggressive behavior.  David candidly told me that he spent approximately 30-minutes inside the Capitol.  He also states, and I believe him, that he spent approximately 15-minutes trying to exit the premises in the face of the incoming crowds.  I unequivocally believe David's account of the Jan 6 incident, and that he very much regrets that his *curiosity* drove him to enter the building.

In summary, I know David Johnston to be a gentleman, professional and was a well-respected attorney.  He is a loving father of two polite and well raised children, and has a 13-year-old special-needs child that requires his substantial oversight.  He is also a dedicated deacon in his church, and my prior Navy boss of several years who attends his church, once told me that David substantially assists with church administration, which includes helping and counseling needy parishioners.  Considering the above, I respectfully request that you give David Johnston the *minimum assignable sentence* allowed under your authority.

Respectfully,

*Clement C. Arsenault*

Clement C. Arsenault -              ., North Charleston, SC  29405



December 2, 2022

Chief Judge Beryl Howell
District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Howell,

I am a 66-year-old chiropractor. I grew up in New Jersey, and received my bachelors degree from a New Jersey state college. I attended chiropractic college South Carolina, and decided to stay in the South.

Throughout my career I have worked with many different attorneys in many different law firms. In 1987 I started working with the George Sink Law Firm. I can tell you that David is different than other attorneys. I have known David Johnston for about 10 years. My friendship with David began purely professional. While he was working for the George Sink Law Firm he referred his clients that lived in my area to my office. David cared for his clients, and always fought for them. He called me more than any other attorney, when he had questions regarding my treatment and prognosis. Sometimes accident cases have problems, and attorneys ask me to reduce my bill in order to settle the case. Numerous times he made it clear that his obligation was to his client not to the treating chiropractor. Over time, I realized that David was always fair, always paid what the case could pay, whether it was my total bill or nothing. Several years ago I told him to stop calling me to ask me to reduce my bill. I told him to just send what he believed would be fair, because we enjoy that level of trust between us.

Last July, although I was fully vaccinated, I was hospitalized with COVID 19. David was the only attorney that called me. He asked if he could help me or my family in any way, and told me he was only a phone call away. He had a flower arrangement sent to me in the hospital. It was a large living arrangement, and the nurses were able to cut the arrangement up, put some of the plants into plastic cups, thereby allowing other patients to have living plants in their rooms.

Several times when David phoned to discuss his clients, I asked for legal advice. He was always more than willing to help me, and always encouraged me to find a solution that did not escalate the disagreement. The last time I asked for advice, David had already stopped practicing law. An attorney asked me to do something I felt was unethical.

David never asked me to do anything I was uncomfortable with regarding his clients. He gave me good advice again, and the attorney was able to settle my patient's case without the incorrect documentation originally requested.

The last patient that David sent me was a very kind woman. She was placed at fault for an accident where she was not at fault. Her car was totaled. Her injuries were serious. She told me that another attorney referred her directly to David. He stopped what he was doing, and met with her and her husband for over an hour. She told me how when she met David she was "keeping up a good front" during the meeting, but David was sensitive enough to realize she was upset. He took the time to help her talk about it and express her fears. She had a good cry in his office, and then came directly to my office because she trusted him, even though prior to meeting him she would not have considered chiropractic treatment. Fortunately, she enjoyed a complete recovery. However, David was arrested before her case had settled, and she was very upset he no longer represented her.

David called me after his arrest. We talked about what he did at the capitol. I know he realizes he made a mistake, and that he is embarrassed, ashamed, and sorry for being part of it. I do not think that one mistake, as serious as it was, should cancel out a career that touched and helped so many of my patients. I have seen firsthand for the past 10 years how David has helped my patients.

Shortly after his arrest, I met with David. I have introduced him to my "doctor friends." They all like him. They all wish him well and hope he gets through this. The first time we met in person, I had invited David to attend a breakfast with other doctors. Several of the doctors were upset that I invited an attorney. However, David explained to us common problems he sees with documentation regarding personal injury cases. Two medical doctors, and osteopath, and another chiropractor thanked me for inviting him. They were appreciative of the information he gave us. They were happy he agreed to come back to our next meeting.

At that first meeting, David asked if anyone knew where he could rent a fishing boat reasonably. I told him that I have a small fishing boat, however it had been in my garage for quite a while, and would probably not run. He asked if he could borrow it, and told me he would make the necessary repairs if he could borrow it in the future. He came to my house to pick it up. Several weeks later he called to tell me the boat was running fine and that he could return it anytime I wanted. I told him I was not in a hurry to use the boat, so he was welcome to use it. He said he would like to teach his son and daughter, as well as his wife how to operate the boat. I later found out that David was given a lot of fishing equipment. He heard about a volunteer program to take military veterans fishing, and that it was something he would like to do after he was given the fishing equipment. When he was given the fishing equipment, he looked for a way that he could help others.

There are a lot of attorneys doing injury work, but David is one of the few good ones. I hope you will give all the good he has done for so many years consideration in your sentencing.

Sincerely,

Anthony Azzolino, D.C.

Nov 16.22

Dear Judge's,
I got acquainted with David
a little over 4 years ago. David
was my George Sink Lawyer.
David is a very caring + helpful
person. He helped bring me through
some very hard time after my husband
got killed in a wreck. He would call
+ check on me so much. I was a Wreck
for a long time but he was always there
for me. He is a good Christian person
Person + I know his wife too. they are
good Caring People.
David regrets the Jan 6 trip
He wants to try + get it behind him.
He was the Best lawyer that I could have
ever had.
I thank you so much for taking time
for + reading my Letter
Thank you
Janie R. Jenkins
Taylors, S.C.

David
Sorry I couldn't write
any better, the wreck
effected my writing

I Hope you + Shelly all
the Best I think about
you all a lot

Thank you

Ian